DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**ALLISON GIACOMARO,**
Appellant,

v.

**JONATHAN BROSSIA,**
Appellee.

No. 4D2024-0824

[October 16, 2024]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Laura C. Burkhart, Judge; L.T. Case No. 502021DR005641.

Susan R. Brown of Susan R. Brown, P.A., Plantation, for appellant.

Gabrielle D'Agostino of Gabrielle D'Agostino, P.A., Boynton Beach, for appellee.

GROSS, J.

This paternity case was tried about six years after the birth of the parties' daughter. Since birth, the child had lived nearly her entire life with the mother in Florida. The father, who lives in Michigan, had limited contact with the child for the first few years of the child's life.

In a March 2024 final judgment, the circuit court, among other things, established majority timesharing with the father in Michigan. The mother appealed, and we expedited consideration of the case.

We reverse the final judgment of paternity because the decision was based on speculation about the father's ability to single-parent the child in Michigan, not on evidence of his capacity to do so.

### *Background*

The parties' daughter was born in September 2017 in Michigan. The mother and child relocated to Florida when the child was an infant.

In July 2021, the father petitioned in Florida to determine paternity and for related relief. At that time, the mother had already sought an injunction for protection against domestic violence against the father. Later that month, a circuit court entered a final judgment of injunction for protection against domestic violence against the father. The mother filed a response and counterpetition to the father's paternity petition, seeking an award of exclusive timesharing and child support. The mother's response included allegations that the father had committed various acts of physical abuse against her.

In December 2021, the circuit court entered an agreed order adjudicating the father as the biological father.

A June 2022 temporary relief order established shared parental responsibility, timesharing, and procedures for timesharing exchanges and communication between the parties. The temporary order allowed the father to exercise timesharing during portions of the summer and winter breaks, among other times.

While the case was pending prior to trial, there were disputes over timesharing, contempt motions, nasty communications from the father, and the failure of the father to pay child support leading to the issuance of a $5,434 money judgment against the father. The mother's hostility to the notion of co-parenting with the father led her to place significant roadblocks to the father's ability to spend time with his daughter. The mother's conduct apparently weighed heavily in the court's ultimate decision that the child should relocate to Michigan.

The case went to trial in September 2023. The court heard testimony from (1) a police officer who had participated in the enforcement of the court's pick-up order, (2) a police officer who had arrested the father at the courthouse for violating a domestic violence injunction, (3) the father, (4) the father's girlfriend, (5) the father's brother, (6), the father's mother, (7) the mother, and (8) the guardian ad litem ("GAL").

The father presented no expert testimony regarding how a change in majority timesharing requiring the child's relocation to Michigan—a significant disruption in the child's life—would impact the child.

In the final judgment of paternity, the circuit court did "not place much weight in the investigation, arrest or alleged violations" of the domestic violence injunction. The court observed that the mother was "weaponizing the legal system to try to gain advantage, not because of any legitimate fear." The court found that it was "in the child's best interest to live with

the [f]ather during the school year but have frequent and continuing contact" with the mother. The court declined to remove the child until she completed the school year.

The court made extensive factual findings regarding the statutory factors in section 61.13(3), Florida Statutes (2023). The court made no findings regarding the relocation factors contained in section 61.13001, Florida Statutes (2023). The court ordered shared parental responsibility and established a timesharing schedule that it found to be in the best interest of the child.

### Standard of Review

A trial court's timesharing determination is reviewed for an abuse of discretion. *Alvares-Watters v. Watters*, 387 So. 3d 327, 330 (Fla. 4th DCA 2024). Discretion is abused "when the judicial action is arbitrary, fanciful, or unreasonable," meaning that no reasonable person "would take the view adopted by the trial court." *Canakaris v. Canakaris*, 382 So. 2d 1197, 1203 (Fla. 1980). An appellate court will not disturb a timesharing decision "unless there is no substantial, competent evidence to support the decision." *Winters v. Brown*, 51 So. 3d 656, 658 (Fla. 4th DCA 2011).

### The Parties' Arguments

The mother argues that the circuit court abused its discretion in awarding majority timesharing to the father and requiring the child to move to Michigan during the school year. She contends that the court's decision was "based on speculation that the [f]ather's situation would change in the future." She argues that the court's factual findings relied on speculation and assumptions about the father's ability to care for the child, including his capacity to provide discipline and routine, maintain an environment free from substance abuse, pay for private school, transport the child, and encourage the parent-child relationship with the mother.[1]

---

[1] The mother also argues that the circuit court abused its discretion by failing to consider the section 61.13001 relocation factors, as the judgment requires the child to move from her home in Florida to Michigan. While case law supports the mother's argument, *see Parris v. Butler*, 264 So. 3d 1089 (Fla. 2d DCA 2019), this issue is unpreserved because the mother never raised this issue in a motion for rehearing. *See* Fla. Fam. L. R. P. 12.530(a) ("To preserve for appeal a challenge to the failure of the trial court to make required findings of fact in the final judgment, a party must raise that issue in a motion for rehearing under this rule.").

3

The father's answer brief does not directly address the mother's arguments on this issue. The answer brief makes factual allegations without citing the record and does not adequately cite legal authority. To the extent an argument can be gleaned from the answer brief, the father contends that the mother is rearguing what has already been litigated in the trial court. Ultimately, the father maintains that the final judgment does not show any errors, abuse of discretion, or failure to determine the best interest of the minor child. The father asserts that the mother "will stop at nothing to keep the child from [him]," including attempting to have him arrested. The father criticizes the mother for obsessively blocking him "from any kind of significant timesharing or relationship with the daughter throughout this case." He asks this court to uphold the final judgment and do what is "in the best interest of the minor child."

### *Analysis of the Timesharing Issue*

Where a court is crafting a timesharing plan for parents at odds, "the best interests of the child must be the primary consideration." § 61.13(3), Fla. Stat. (2023). "Determination of the best interests of the child must be made by evaluating all of the factors affecting the welfare and interests of the particular minor child and the circumstances of that family[.]" *Id.* The statute sets forth a non-exclusive list of twenty factors that shall be considered. *Id.*

"A court may not consider potential future, or even anticipated, events as a substitute for evidence." *Solomon v. Solomon*, 221 So. 3d 652, 655 (Fla. 4th DCA 2017). For example, in *Arthur v. Arthur*, 54 So. 3d 454, 459 (Fla. 2010), the Florida Supreme Court held that "a best interests determination in petitions for relocation must be made at the time of the final hearing and must be supported by competent, substantial evidence." *Id.* A "prospective-based" analysis is unsound because "a trial court is not equipped with a 'crystal ball' that enables it to prophetically determine whether future relocation is in the best interests of a child." *Id.*

Recognizing that no trial judge has a crystal ball to see into the future, the court in *Natali v. Natali*, 313 So. 3d 958, 960 (Fla. 2d DCA 2021), held that a parenting plan allowing the father to automatically graduate to unsupervised timesharing upon satisfaction of predetermined conditions was an impermissible prospective-based plan. Likewise, in *Hughes v. Binney*, 285 So. 3d 996, 998 (Fla. 1st DCA 2019), the court held that a custody modification order providing for automatic future modification of timesharing if the father completed certain conditions—including completing Veterans' court, obtaining his own residence, and avoiding motor vehicle violations—was a prohibited prospective-based order.

4

Here, the circuit court abused its discretion in awarding majority timesharing to the father because the court's decision was based on speculation that the father's living situation would improve.

The circuit court's focus on speculation was evident by its questioning of the GAL, much of which was accomplished by leading questions that buttressed the father's case. Prior to the court's questioning, the GAL opined that a standard long-distance parenting plan, with the child spending summers and many holidays with the father, would be in the child's best interest. The GAL did not believe it was in the child's best interests to be relocated to Michigan, as the child was stable, was in a good school, and had a good routine in Florida. The GAL thought it would be "very difficult" for the father to operate as the primary parent in Michigan.

The circuit court then elicited speculative testimony from the GAL, asking the hypothetical question of whether the GAL's opinion would change if the father obtained a driver's license and his business was functioning. The GAL responded that this would "probably change" her opinion, adding that as far as "the first couple of factors under the statute," the father would probably "be better at facilitating a relationship between [m]om and child as opposed to the other way around." The GAL also noted that the father had the qualities of a "traditional good parent," and that, if he had those other things worked out, then "he would be able to facilitate being the primary parent." The court appeared to rely on this testimony, but this hypothetical was counterfactual because the father had neither a driver's license, due to three DUI convictions, nor a fully established business at the time of the final hearing. The GAL's testimony that the court's hypothetical would "probably change" her opinion, particularly as to the first two statutory factors, was a prospective-based analysis that did not provide competent, substantial evidence for any of the court's findings.

Further, the court made speculative findings regarding the statutory factors for determining the best interests of the child. For example, the court speculated that the father would be able to rely on friends and family or ride-sharing services to transport his daughter until his driver's license was reinstated. But the father did not present any competent, substantial evidence that he would be able to rely extensively on third parties for the child's transportation to school and extracurricular activities for the entirety of a school year. He also did not present any concrete evidence as to when his driver's license might be reinstated, as he offered only vague testimony that he should have it back "soon."

5

The court's finding that the father would be able to maintain an environment free from substance abuse was likewise conjectural. The father had three prior DUIs. The father's girlfriend conceded that the father drinks alcohol two-to-four days a week, usually drinking three or four beers on an average night, but sometimes as much as a six-pack in one sitting. The girlfriend also testified that the father consumed marijuana "maybe four times a week," though she claimed it was only "like a hit of it" and it did not occur with the child present. In short, the court minimized the father's issues with alcohol and marijuana based on conjecture rather than evidence or a proven track record.

Also speculative was the court's finding that the father would be able to meet the child's needs as the parent with majority timesharing. The best detailed, neutral evidence of the condition of the father's home life came from the GAL, who testified that the father still needed to establish himself in his career and achieve a financially stable position, and that he was "not there yet." Further, the GAL's description of the father's living conditions—a home in disrepair, tools lying on the floor, a dirty and empty refrigerator—undermines the notion that the father would be able to care for the child as the primary caregiver.

The circuit court's handling of the section 61.13(3)(d) factor is also at odds with the evidence. That section concerns "[t]he length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity." § 61.13(3)(d), Fla. Stat. (2023). Even though the child had lived with the mother in Florida for about six years by the time of trial, the court treated this as a neutral factor, citing the father's testimony that the mother had "moved multiple times with different men" and finding that there was "no evidence that the child has a deep connection to her current living environment." That the mother had "several boyfriends" is irrelevant, because the father did not show that the mother prioritized boyfriends over the child.

While the mother may have moved multiple times, the court's suggestion that the child lacked a connection to her current living environment was not supported by competent, substantial evidence. The GAL testified that the child was stable, was in a good school, and had a good routine in Florida with the mother. The GAL described the mother's home as very nice. The maternal grandmother lived near the mother, and the GAL had a positive impression of her. The court even acknowledged that the mother "has a support network from her own mother who assists her with the minor child when needed." Moreover, the court found under the section 61.13(3)(k) factor that the child was "well cared for" by the mother and suggested that the child was "excelling" in the mother's care.

6

*See* § 61.13(3)(k), Fla. Stat. (2023) ("The demonstrated capacity and disposition of each parent to provide a consistent routine for the child, such as discipline, and daily schedules for homework, meals, and bedtime.").

We emphasize that a trial court's decision on a timesharing issue "must be based upon the best interests of the child and not as a sanction for the conduct of either of the parties." *Decker v. Lyle*, 848 So. 2d 501, 503 (Fla. 2d DCA 2003). "Florida courts have consistently reversed orders or judgments that granted custody to one parent based on sanctions imposed for the other parent's recalcitrance." *Rahall v. Cheaib-Rahall*, 937 So. 2d 1223, 1224 (Fla. 2d DCA 2006). "In other words, a parent's actions in the lawsuit cannot trump the child's right to have custody decided based on his or her best interests." *Id.* at 1225.

Here, although the court did not explicitly state that the timesharing determination was a sanction for the mother's recalcitrant conduct, we conclude that it was an abuse of discretion for the court to have placed so much weight on the mother's conduct regarding the father's exercise of timesharing, given the scarcity of testimony evaluating the child's best interests regarding the change of majority timesharing.

### Child Support Issues

As to the child support issues, we find no abuse of discretion in the denial of retroactive child support. However, because the final judgment does not preserve the mother's right to any temporary support arrearages that the father had accumulated after the July 2023 arrearage judgment, we reverse and remand with instructions for the trial court to incorporate any of the father's outstanding temporary support arrearages into the final judgment. *See Sims v. Sims*, 846 So. 2d 1188, 1188–89 (Fla. 4th DCA 2003); *Roth v. Roth*, 658 So. 2d 1225, 1226 (Fla. 4th DCA 1995).

### Conclusion

We reverse the final judgment and remand to the circuit court for further proceedings consistent with this opinion. In its discretion, the trial court may hear further testimony, including about conditions since the March 2024 final judgment.

*Reversed and remanded.*

CIKLIN and KUNTZ, JJ., concur.

*          *          *

*Not final until disposition of timely filed motion for rehearing.*